Filed 11/6/25  P. v. Arciga CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HECTOR ARCIGA,<br><br>    Defendant and Appellant. | B337709<br><br>(Los Angeles County<br> Super. Ct. No. VA114995) |

APPEAL from an order of the Superior Court of Los Angeles County, Maria Andrea Davalos, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, and Hector Arciga, in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In 2014, a jury convicted Hector Arciga of first degree murder, four counts of home invasion robbery, one count of first degree burglary, and possession of a firearm by a felon. The jury further found true multiple firearm enhancements and the special circumstance allegation that the murder was committed during the robbery and burglary. Thereafter, Arciga petitioned for resentencing under Penal Code section 1172.6.[1] After an evidentiary hearing, the trial court denied the petition, finding that Arciga was a major participant who acted with reckless indifference to human life. Arciga appeals form the order denying the petition. His appellate counsel filed a brief under *People v. Delgadillo* (2022) 14 Cal.5th 216. Arciga filed a supplemental brief challenging the denial of his section 1172.6 petition and asserted a claim of ineffective assistance of appellate counsel. We have exercised our discretion and independently reviewed the record for any arguable issues. Having found none, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Evidence at Arciga's Trial*

The following facts are from this court's nonpublished opinion in *People v. Arciga* (Feb. 25, 2016, B258201) (*Arciga*), which affirmed the judgment in Arciga's direct appeal.

According to the prosecution, Arciga, along with his codefendants Pedro Huerta Zuniga, and Francisco Argenis Parra had a scheme to rob drug dealers. After gaining a drug dealer's trust by making an initial small purchase, they would set up a larger drug purchase. During this second encounter, they would rob the drug dealer of money and drugs. In the

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

2

instant case, Carlos Zarate was killed and another was injured (Manuel Rojas) during the second drug purchase.

Jesus Vasquez testified he was a close friend of Zarate's. About a week and a half before Zarate's murder, Vasquez was present when Zarate sold 20 pounds of marijuana to Parra and Zuniga. On April 22, 2009, Vasquez, Martha Gutierrez (his mother-in-law), Zarate, and Rojas went to an apartment in Bellflower to sell 140 pounds of marijuana to Parra and Zuniga. They brought 60 pounds of the drug with them, and planned to deliver the remainder after receiving the money. Parra was waiting outside the apartment; Zuniga and Arciga were waiting inside. The parties exchanged drugs and money. Arciga checked the product, while Gutierrez started counting the money. She asked Vasquez to assist her. As Vasquez was walking toward Gutierrez, he glimpsed Zuniga pulling a handgun from his waist. He heard several gunshots and saw Zarate staggering. Vasquez also saw Arciga shooting at Zarate while walking toward him. After Zarate had fallen to the ground, Arciga fired five more shots at him. Zuniga then snatched the money from Gutierrez. At around the same time, Vasquez heard Rojas screaming. After another gunshot, Vasquez observed Rojas on the floor. Parra took the bag containing the marijuana and handed it to Zuniga. Zuniga then dragged the bag to the exit. Vasquez did not see Arciga, but presumed that he had already left the apartment. Parra, who was armed with a semi-automatic, pointed the gun at Vasquez, and asked Vasquez if he had a gun. Vasquez told him, "No," and lifted his shirt to show he was not armed. Gutierrez also interposed herself between Parra and Vasquez. As Parra turned to leave, he struck Rojas, who was still on the ground, on the top of the head with his gun. After Parra left, Vasquez ran toward Zarate's body and started screaming to wake him up. He noticed a .45-caliber

3

handgun on top of the body.  Vasquez recognized that the gun belonged to him, and took it.  He subsequently disposed of the gun.  Vasquez, Gutierrez, and Rojas then left the apartment.  Vasquez did not call 911 after the shooting or contact the police.  Rather, the police contacted him later.

Rojas's and Gutierrez's trial testimony was substantially similar to Vasquez's testimony.  Rojas testified that he realized it was a setup when Gutierrez was counting the stacks of money, and there were large bills on top of the stacks and $1 bills underneath.  At almost the same instant, Rojas heard someone say, "This is a stick up."  He saw Zarate reach for his gun, but Zarate did not have enough time to pull it out before he was shot.  After Zarate fell to the ground, Gutierrez yelled out, "Oh, my God.  Run.  Run."  Rojas panicked and ran toward the front door.  Arciga then shot him in the left buttocks area, and Rojas fell to the ground.  He closed his eyes and pretended to be dead.  He heard people walking out and dragging the bag of drugs with them.  As the last person left, someone pistol-whipped Rojas.  From their positions in the apartment, Rojas deduced that it was Parra who had pistol-whipped him.

After the men left, Gutierrez had someone drive Rojas to a nearby hospital, where he had surgery to repair a shattered left femur bone.  Police officers interviewed Rojas at the hospital; he told them he had been shot in a driveby shooting by unknown assailants.  However, Rojas, who was working as an informant for the Drug Enforcement Administration (DEA), called his handler that day and informed the DEA agent about what had happened.  A few days later, Los Angeles Sheriff's Department deputy sheriff and homicide detective Steven Blagg, after being informed that Rojas had pertinent information about the shooting, met with Rojas.  Rojas described the actual events to the detective.

Gutierrez testified that when the shooting started, she covered her face. Later, she saw Zuniga pointing a gun at Vasquez. She went over and pushed the gun away from Vasquez's face. Gutierrez did not know that Zarate had died until she was informed a few days later. She did not go to the police. Instead, the police contacted her.

Eusebio Alvarez, a friend of Arciga's, testified about certain statements Arciga and Zuniga had made to him after the shooting. Previously, Arciga had told Alvarez that Parra's father was involved in "dope rips"—robbing drug dealers. On April 22, 2009, Arciga called Alvarez, saying, "I got some weed right now, but you got to let me know if you want it because something went wrong right now. It's hot. I just shot somebody." Later that day, Arciga came to Alvarez's house with some marijuana. Arciga asked Alvarez if Alvarez could "get rid of [the drugs] quick or something because it was real hot." Arciga said he had been involved in a shoot-out: he had shot a man and after the man fell down, he had walked up and shot him several times. Arciga said Zuniga and Parra were present.

Alvarez testified he did not sell any of the marijuana for Arciga. However, for $100, he helped Arciga dispose of a nine-millimeter handgun Arciga said he had used to kill the man.

A few days later, Zuniga contacted Alvarez, saying he had some crystal methamphetamine he wanted Alvarez to sell. Zuniga admitted there had been a shoot-out, but said Arciga had lied about shooting the victim. He bragged, "[Arciga] is talking all this bullshit. I was the one that did it. I'm the one that shot the guy."

Maria Eduvina Arteaga de Ayala (Ayala) testified that she lived at the apartment where the shooting occurred. About a week before the shooting, Arciga and "Miguel" asked about using her apartment to host two people

5

visiting from Mexico. Arciga also asked her if she wanted to work with them as a driver. He showed her a box of cash and a handgun. On April 22, 2009, Miguel called her and stated they wanted her apartment "empty." Ayala left the apartment, leaving the door unlocked. As she was driving away from her apartment that morning, she observed Arciga driving in the opposite direction. Later that day, the manager of the apartment complex called Ayala, and told her there was a dead man in her apartment. When Ayala was later interviewed by Detective Blagg, she initially lied before telling him the truth. Ayala testified she did not want to work with Arciga, and she never gave anyone permission to use her apartment to engage in drug deals or to rob drug dealers.

On November 10, 2009, Parra was stopped for speeding. He was arrested for driving without a license and the vehicle was impounded. During the inventory search of the vehicle, two handguns were recovered from the trunk, including a nine-millimeter Sig Sauer. Parra told Los Angeles Police Officer Arturo Koenig that he was going to meet and rob a drug dealer of 200 pounds of marijuana. He admitted being involved in a prior robbery of a drug dealer, at "32nd and Central" in Los Angeles.

Steven Scholtz, a coroner, testified that he performed an autopsy on Zarate's body. Zarate had suffered nine gunshot wounds, including three that Scholtz opined were fatal.

Phil Teramoto, a criminalist, testified about firearm-related evidence recovered at the crime scene. From various tests, Teramoto concluded that three firearms were used during the shoot-out: (1) a .45-caliber handgun that fired a single shot, (2) a nine-millimeter handgun that fired eight shots, and (3) a nine-millimeter Sig Sauer—the handgun recovered from Parra's vehicle—that fired one shot. A bullet recovered from Rojas's body was

6

matched to bullets fired from the Sig Sauer handgun, and two bullets recovered from Zarate's body were matched with the bullets fired from the other nine-millimeter handgun. Teramoto also testified that the shot fired from the .45-caliber handgun had a northern trajectory and hit an exercise machine at 16.5 inches above the ground.

Los Angeles County Sheriff Deputy Mario Cortez, a latent print examiner, testified that he matched latent prints developed from evidence found at the crime scene with fingerprint exemplars from Parra and Zuniga. Luis Olmos, a criminalist, testified that analysis of DNA found on certain items at the crime scene indicated that multiple persons handled the items. Based on their respective DNA profiles, Arciga and Zuniga were possible contributors to the DNA mixture found on some of the items.

On March 31, 2010, Detective Blagg and two fellow officers interviewed Arciga following his arrest on an unrelated crime. A recording of the interview was played for the jury. After waiving his *Miranda* rights, Arciga told the officers he had been acquainted with Parra and his father for about two years. According to Arciga, Parra's father was involved in robbing drug dealers. Arciga acted as a lookout during two of these robberies. On one of those occasions, Zuniga was present. Arciga said that by April 2009 he was no longer working with Parra's father or Zuniga. He also denied knowing Zarate, and initially denied ever being in Bellflower. After being informed that he had been identified by several witnesses as a shooter during Zarate's murder and that his cellphone had been used in Bellflower on April 22, 2009, Arciga conceded that he had gone with Parra's father on a drug deal and that they may have gone to Bellflower.

After further questioning, Arciga admitted going to an apartment in Bellflower with Parra's father, Parra, and Zuniga to rob drug dealers. Arciga

7

was not armed, but Parra's father and Zuniga were armed with pistols. At the apartment, they met four drug dealers—a woman and three men—who brought 60 pounds of marijuana. Arciga checked the product while the woman counted the money. He heard some commotion and looked up. He saw one of the male drug dealers pull out a pistol, and almost simultaneously Zuniga pulled out his gun. Arciga did not see Zuniga shooting; he just heard shots. Arciga ran out of the apartment with the bag of drugs. As he did so, he saw the drug dealer with the pistol fall to the ground.

### 2. *Verdict and Sentence*

A jury convicted Arciga of first degree murder (§ 187, subd. (a); count 1), possession of a firearm by a felon (§ 12021, subd. (a)(1); count 4), home invasion robbery of Zarate, Rojas, Gutierrez, and Vasquez (§ 211; counts 6-9), and first degree burglary (§ 459; count 10). The jury also found true the special circumstance allegation that the murder was committed in the commission of a robbery and a burglary (§ 190.2, subd. (a)(17)). As to counts 1, 6, 7, 8, and 9, the jury found true Arciga personally used a firearm within the meaning of section 12022.53, subdivision (b) and as to count 10, Arciga also personally used a firearm within the meaning of section 12022.5, subdivision (a). The trial court sentenced Arciga to life imprisonment without the possibility of parole, plus 40 years, 4 months.

On appeal, a different panel of this court affirmed the judgment.

### 3. *Section 1172.6 Petition and Evidentiary Hearing*

On June 17, 2019, Arciga filed a petition for resentencing under section 1170.95, now section 1172.6. On July 2, 2019, the trial court found Arciga had established a prima facie case for relief and issued an order to show

cause why his petition should not be granted. The court appointed counsel for Arciga.

On March 6, 2020, the People filed an opposition. The People argued that Arciga was ineligible for relief because the jury found true the special circumstance allegation that the murder was committed in the commission of a robbery and a burglary under section 190.2, subdivision (a)(17). On April 14, 2020, Arciga filed a reply to the opposition. He argued he was not the actual killer, did not have the specific intent to kill, and was not a major participant who acted with reckless indifference to human life. Then on March 27, 2023, Arciga filed a brief for the evidentiary hearing, asserting the same arguments in his reply brief.

On April 26, 2024, the trial court held an evidentiary hearing on the petition. The court stated it had reviewed Arciga's petition, the preliminary hearing, and jury trial transcripts as well as the trial exhibits. The court ultimately denied the petition, finding that the People had met their burden of proving beyond a reasonable doubt that Arciga was a major participant in the felonies and acted with reckless indifference to human life.

In determining Arciga was a major participant, the trial court made the following findings. Arciga engaged in an orchestrated plan to commit a robbery by entering an apartment and using guns, zip ties, and a baton. The plan was put into motion a week before the murder was committed. Specifically, Arciga went armed with a firearm to Ayala's apartment with his friend "Miguel," trying to recruit Ayala and use her apartment in exchange for money. The day of the murder, Miguel called Ayala and said they needed the apartment empty that day. When she left the apartment, Ayala saw Arciga driving towards her apartment. Thus, part of Arciga's role in planning the robbery was to secure the apartment. Prior to entering the

9

apartment, Arciga also wrapped the money that was to be presented to the victim to purchase the drugs. In addition, he was in charge of checking the drugs once they were inside the apartment. Arciga further agreed to carry a firearm during the robbery, to display it, and was in fact armed with a firearm during the incident.

While it was not clear who shot and killed the victim, Arciga was present and available to use lethal force to assist with the robbery. Aside from Zarate, the other sellers were unarmed and were not in a position to defend themselves. Arciga was subjectively aware of the inherent danger of participating in an armed robbery. He was also more aware than the "average person" because he planned and went to commit the robbery with people he knew were also armed. Moreover, it is reasonable to infer Arciga knew they were armed because he never expressed shock that firearms were used during the robbery. In fact, he told his friend Alvarez that he "shot too." Also, the fact that all perpetrators, including Arciga, pulled out their guns at the same time after somebody said, "this is a stick up," demonstrates Arciga was aware use of a firearm was necessary to commit the robbery. The court noted there was no evidence that Arciga knew his codefendants propensity for violence or whether it was likely they would use lethal force. Arciga was also in a position to prevent the murder but did nothing to prevent it. Arciga made no effort to render aid to the victim after he was shot or call 911. Instead, he paid Alvarez to dispose of his firearm and sell the stolen drugs.

In determining Arciga acted with reckless indifference to human life, the trial court noted that many factors for assessing whether a defendant was a major participant overlap with the finding of reckless indifference to human life. The court then reiterated relevant factors to support its finding.

Arciga timely appealed.

10

**DISCUSSION**

1.  *Senate Bill No. 1437 and Standard of Review*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and subsequent related legislation limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*), superseded by statue on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

Senate Bill 1437 added section 188, subdivision (a)(3), which provides that "to be convicted of murder, a principal in a crime shall act with malice aforethought" and malice "shall not be imputed to a person based solely on his or her participation in a crime." Senate Bill 1437 also amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile, supra*, 10 Cal.5th at p. 842.)

Senate Bill 1437 created a procedure, codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of those crimes under current law. (*People v. Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a

11

declaration that, among other things, the defendant could not presently be convicted of murder under current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

We review a trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

2. *Major Participant Who Acted With Reckless Indifference to Human Life*

At an evidentiary hearing to determine whether a defendant was a major participant who acted with reckless indifference to human life, a trial court must consider the factors identified in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

First, to determine "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant," a court should consider, "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did

12

his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at pp. 794, 803, fn. omitted.)

Second, factors to consider when determining reckless indifference are: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

Substantial evidence supports the trial court's finding that Arciga could be convicted of first degree murder under current law. As laid out in detail by the trial court, Arciga engaged in an orchestrated plan to commit the robbery. Arciga, along with his cohorts, entered the apartment armed with firearms, zip ties, and a baton. This plan was set in motion a week prior to the murder. Arciga had secured the apartment by recruiting Ayala and wrapped the money that was to be used in the "purchase" of the drugs. While it was not entirely clear who shot and killed the victim, Arciga was present, armed, and ready to use lethal force to assist with the robbery. The evidence established that Arciga knew his cohorts were armed; he did not express shock that any firearms were used during the commission of the robbery. Rather, he told his friend he was the shooter and had that friend not only sell the stolen drugs but dispose of his firearm. Arciga was in a position to

13

prevent the murder but did nothing to stop it. He also did not provide any aid to the victim or call the police after the incident.

The totality of the *Banks*/*Clark* factors supports the trial court's finding that Arciga was a major participant in the burglary who acted with reckless indifference to human life under current law. (See generally *Tison v. Arizona* (1987) 481 U.S. 137, 158 [Tison brothers' "high level of participation" in kidnapping and robbery "implicates" them in culminating murder of a family].) Contrary to Arciga's contention, the prosecution did not need to prove he was the actual killer at the evidentiary hearing. Rather, the prosecution had the burden of proving he was a major participant who acted with reckless indifference to human life. As discussed above, the prosecution met their burden beyond a reasonable doubt.

Arciaga also argues that appellate counsel was ineffective and committed fraud on the court because he filed a *Delgadillo* brief without reviewing the record. Also, counsel did not know where he was incarcerated. Even assuming that this is true, Arciga fails to articulate how these alleged deficiencies in appellate counsel's performance were prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

14

## DISPOSITION

The order denying Arciga's section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, P. J.

WE CONCUR:


MORI, J.


TAMZARIAN, J.